## Andrew J. Foltz v. The People of the State of Illinois, ex rel. William H. Mings.

### Gen. No. 4,430.

1. EVIDENCE—*what incompetent, as to fairness of election.* Particular evidence as to events which occurred before election day, the suspicions of the respective parties and the grounds they had therefor, are incompetent upon a contest of the election in question.

2. ELECTION—*right of citizens to hold.* After election officers provided by law have for five hours failed to open the polls and begin to hold the election, the citizens present have a right to elect another board and proceed to hold an election.

3. INCOMPETENT EVIDENCE—*when admission of, will not reverse.* The admission of incompetent evidence will not reverse where the case has been tried by the court without a jury and there is sufficient competent evidence in the record to justify the finding.

FARMER, P. J., dissenting in part.

*Quo warranto* proceeding. Appeal from the Circuit Court of Iroquois County; the Hon. ROBERT W. HILSCHER, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed March 8, 1905.

J. W. SHEPHERD and H. S. TANNER, for appellant.

H. J. HAMLIN, Attorney-General, for appellee; J. W. HOWELL, W. H. CLINTON, J. E. LAMB and J. E. DYAS, of counsel.

MR. JUSTICE DIBELL delivered the opinion of the court.

The attorney-general on the relation of William H. Mings, filed in the Circuit Court of Edgar county an information in the nature of a *quo warranto*, to test the right of Andrew J. Foltz to hold and execute the office of supervisor of the town of Stratton in said county, which office the information charged said Foltz was usurping. Certain pleas were filed and afterwards withdrawn by agreement, and thereafter certain amended special pleas and general and special replications were filed, of which it is sufficient to say that they raised the issues which were tried. On application of the respondent, the venue was changed to

the Circuit Court of Iroquois county. A jury was waived. Respondent assumed the burden of proof. The proofs were heard. Respondent presented certain propositions of law, some of which were given, some refused, and some modified and given. The court found respondent had usurped the office of supervisor of the town of Stratton, and entered judgment of ouster, from which judgment respondent prosecutes this appeal.

This suit is the outgrowth of a controversy between the judges of election in said town, on the morning of the annual election for township officers in April, 1903, which resulted in two sets of election officers holding an election in said town on the afternoon of that day at different polling places, at one of which 180 votes were cast, of which 172 were for Mings for supervisor, and six were for Foltz, and two were rejected; and at the other forty-nine votes were cast, of which forty-seven were for Foltz, one for Mings and one was rejected. Each presented a bond and an oath of office. Foltz was seated. Mings was then holding the office of supervisor, and was the republican nominee for re-election. Foltz was the democratic nominee for that office. Each had been regularly nominated and certified, and the name of each was properly upon the official ballot, and each had qualifications entitling him to hold the office, if elected thereto. Dinkins was town clerk, and was the republican candidate for that office, and Burchit was the democratic candidate. Mason was the democratic candidate for assessor. Sanders was the republican candidate for poundmaster. Crawford was a justice of the peace. Mings, Blackman and Burchit had previously been lawfully authorized to act as judges of that election. Blackman and Burchit were democrats; Mings was a republican. Blackman and Burchit selected Ford and Mason, democrats, and Owen Myers, a republican, to act as clerks. The evening before the election Dinkins, the town clerk, delivered the official ballots to Mings, the supervisor, and the next morning, at the polling place, Dinkins delivered the ballot box to Mings. The three judges and the persons selected as

clerks met at a room on the first floor of the Masonic building in the village of Vermilion, which had long been occupied by the town clerk and other town officers, being the place where the notice for the election provided it should be held, and the room which had been the regular polling place in that town for many years. The judges and clerks were sworn. Mings, the only republican judge, objected to the selection of Owen Myers as the representative of the republican party among the clerks, declaring that he was not a representative of the republican party, and that he was an enemy of Mings. It is a disputed question of fact whether Mings made this objection before or after Myers had been sworn. Mings produced 278 ballots (being about half the number he had received), and laid them upon the table. He opened the ballot box, showed the other judges that it was empty, and then closed and locked it, and retained it in his possession. Blackman and Burchit demanded the rest of the ballots. Mings refused. The other judges said they had to receipt for them. Mings replied that he had already counted and receipted for the ballots, and that he would furnish them with more ballots when they were needed. He also refused to surrender the ballot box to the other judges, but declared that he would hold the ballot box and put in the ballots himself. Blackman took possession of the 278 ballots. Blackman and Burchit refused to proceed with the election under these circumstances, but demanded that the ballot box and the remaining ballots be first delivered to them. Mings refused to proceed with Myers as clerk, and insisted on retaining possession of the box and of the rest of the ballots. The room filled with citizens and there was a great uproar, which continued for an hour or more. Then some citizen moved the selection of certain other persons as judges and clerks of that election. This motion was put to a vote by Crawford, who had theretofore been elected moderator of the meeting, and this new election board was sworn in. It, however, did no act toward holding an election. Mings went out and was gone awhile,

leaving the ballot box in possession of one of his adherents, who retained it in spite of a request by the democratic judges for its possession. Mings returned and a compromise was arranged between.Blackman, Burchit and Mings. It was agreed that Dinkins, who was a republican, should be sworn as one of the clerks. According to testimony offered by relator, Dinkins was to take the place of Owen Myers. According to testimony introduced by respondent, Dinkins was to take the place of Mason, one of the democratic clerks. It was agreed that Mings should put the ballots into the box. This third board was sworn in. If Owen Myers was to be a clerk on this compromise board, he declined, saying that he would not act as democratic clerk, and another was sworn in his place. After the third board had been sworn in, Blackman left the room and had an interview with Simon Myers, the father of Owen Myers, and upon returning to the election room, Blackman declared that he would not stand by the compromise agreement, that the boys would not stand for it, and that Owen Myers must serve as clerk. To this Mings refused to consent, and there was great noise and confusion. The controversy continued till noon, a period of five hours. The room was filled with citizens who had come for the purpose of voting, and many of whom demanded the right to cast their ballots and return to their homes or business. About twelve o'clock, one of. the citizens present proceeded to nominate judges and clerks, nominating one at a time, whose name was put before the citizens by the moderator and declared elected upon a vote of the citizens present. According to respondent's proofs Sanders, an adherent of Mings, made all the motions and nominations voted upon by the citizens that forenoon. According to relator's proofs, the motions came from all parts of the room. Either three or four democrats were separately nominated as one of the three judges, but each declined to serve, and the board then elected by the citizens present was therefore composed entirely of republicans; the board so elected being Mings, Stauts and Cassle, judges, and White, Raines

and Dinkins, clerks. This board was sworn in by Craw-
ford, and opened the election in that room, and began re-
ceiving ballots. They had the ballot box and all the ballots
except the 278 taken by Blackman and they had the polling
books and tally sheets. They organized as a board on the
north side of the room. The other two original judges
and the three original clerks gathered together on the
south side of the room as an election board but received no
ballots there. The election board on the north side of the
room placed a guard in charge, who caused the crowd to
leave the room, in order that balloting might proceed.
Citizens then came in from the outside and voted. After
a number of votes had been received Simon Myers came in.
There is a dispute as to what occurred there at that time.
He was offered the opportunity to vote by the board then
in charge of the election, but declined to vote, and respond-
ent's proof tends to show that he desired to vote with the
election judges on the south side of the room, and that the
judges on the north side would not permit him to do so,
but that he was put out by some man who seemed to be in
charge of the room, and with force and violence. The proof
offered by relator tends to show that he not only declined
to vote at the polling place on the north side, but an-
nounced that he was not ready to vote, and that he would
vote when he got ready, and was told by the officers in
charge that if he did not wish to vote he must leave the
room; and that he was in a intoxicated condition and
quarrelsome. It is clear that he had been drinking, and
had a bottle of whiskey in his pocket, but the evidence in-
dicates he was not the only one who had been using liquor.
The proof offered by respondent tends to show that the
election board on the north side of the room would not per-
mit the election board on the south side to receive ballots,
either in the room or through the window. The proof
offered by relator tends to show that those on the south
side requested the officials on the north side to put them
out, but that the latter refused to do so. Whatever the
exact facts may have been in that respect, the election

board on the south side of the room decided to leave and establish a polling place outdoors, and relator's proof tends to show that when they left some thirty or forty votes had been cast at the polls on the north side. Mings demanded the 278 ballots. Blackman refused to give them up, and an altercation occurred between them, in which fourteen ballots were destroyed. Blackman retained the rest. Blackman and Burchit and the three original clerks then proceeded across the street from the Masonic building and opened a polling place in the street on the opposite side. They procured a box, cut a hole in it through which to put the ballots, hung up a coat in such a way as to form a booth, and placed a pencil in the booth. They selected Long as the republican judge. He was a tenant or laborer on a farm owned by Simon Myers, and though a republican, did not vote the republican ticket that day. Voting in the street began about one o'clock in the afternoon. Thereafter each polling place was quietly conducted, with the results already stated.

Some testimony was introduced tending to explain the cause of the ill-feeling exhibited at the polling place that forenoon. Most of the explanatory testimony was introduced by the relator, but some was introduced by the respondent. Part of it was heard without objection. Objections interposed to some of this testimony were overruled; and upon other objections the court held the evidence incompetent, and that if a jury were present it would not be heard, but in the absence of a jury it would be admitted subject to objections, and no subsequent ruling was made. Simon Myers and Mings were brothers-in-law, and it seems there was an enmity between them. Though Simon and his son were republicans they were opposed to the election of Mings. The democratic election judges and some other democrats held a meeting at Simon Myers' home a few days before the election at which the conduct of the election was considered. Foltz was consulted, and with his approval Owen Myers was agreed upon as the republican clerk upon the board. This was done without consulting

Mings and without his prior knowledge. The day before the election the democratic judges consulted a lawyer who was chairman of their county committee. These facts came to Mings' knowledge before the morning of the election, and he claimed to believe that these arrangements had been made for the purpose of stealing the election from him. On the other hand, one of the democratic judges claimed to have information that Mings intended to have the polling place removed that morning from the Masonic building to a private office where there was a partition, by means of which some crooked work might be accomplished. There was no evidence justifying the conclusion that any of these election officers had any unlawful purpose or desired anything except a fair election, but each side was evidently suspicious of the other. The discussion that morning indicated that something had occurred at some former election which aggravated the feeling of mistrust. It is hardly conceivable that Mings could have intended to resort to any fraudulent practices, for the result shows that more than three-fourths of all the voters of the town desired his re-election, and it is reasonable to assume that he knew that fact. It is hardly possible that it could have been seriously feared that he alone on the election board could move the polling place. Nevertheless, it is plain that the course that he pursued that morning was not defensible. The majority of the board had the right to rule, and they had the right to have possession and control of all the ballots and of the ballot box, and they had the right to determine who should give out the ballots and who should put them in the ballot box. It is clear, however, that a large majority of the citizens present continuously supported Mings' contention that Owen Myers should not be the republican clerk on the board and upheld Mings in his determination to hold the ballot box and put the ballots into it himself. When these citizens finally established an election board of their own they put Mings upon it.

We are of opinion that the explanatory evidence to which we have referred showing the events which occurred before

election day, the suspicions of the respective parties and the grounds they had therefor, were incompetent, and that the motives which governed the various parties in their conduct that forenoon were not material to the decision of this suit. But the case was tried without a jury, and in such case the admission of incompetent testimony is not a ground for reversal, where the competent testimony justifies the judgment rendered. Palmer v. Meriden Britannia Co., 188 Ill. 508. When many objections to this class of testimony were made, the trial judge announced that he would hear the testimony subject to objection and make a ruling later. No subsequent ruling was requested by either party, or obtained, except as the subject was covered by propositions of law presented by respondent and held by the court. The record does not show reversible error in what occurred concerning the reception of this explanatory testimony.

The argument of respondent seems to be that if Mings was in part responsible for the deadlock, and if the positions he took were untenable, then the respondent was lawfully elected, and is entitled to hold the office. We are of opinion that the true question is not who was to blame for the events of that forenoon, but what rights the voters had. A large number of them had been in attendance from seven o'clock in the morning until noon, a period of five hours. There had been much quarreling, and at times almost rioting. Many of them wished to vote and depart, and they had for hours been demanding the right to cast their votes. Section 36 of the act of April 3, 1872, in regard to elections, is as follows: "If, at the time for the opening of an election, any person appointed or constituted a judge of election shall not be present, or will not act or take the oath to act in such capacity, the judge or judges present may appoint some other qualified elector to act in his place. If there be no judge of election present, or he refuses to act, such electors of the precinct or district as may then be present at the place of election may fill the places of such judges by election from their number. The judges so ap-

Foltz v. The People.

pointed shall have the same power and be subject to the same penalties as other judges of election." The original election board, the second board elected by the citizens, and the third board arranged by a compromise, and each sworn in, had failed to hold an election. Each side was ready and willing to hold an election, provided it could hold it in the manner it desired, but each side refused to yield to the other. One side had the greater number of the judges and clerks of the original selection. The other side had the ballot box and a large number of official ballots, and the poll books and tally sheets. We think it is sufficiently manifest that if the general feeling of the citizens present had been with the men who constituted the majority of the original board, the election would have proceeded; but that there was a very great unwillingness to permit it to proceed because of a suspicion arising from the insistence that Owen Myers should be the republican clerk that some improper course of conduct was designed.

After the election officers provided by law had for five hours failed to open the polls and begin holding the election, we are of opinion that the citizens present had a right, under the statute which we have above quoted, to elect another board and proceed to hold the election. We therefore conclude that the election board organized by the citizens at noon, and which conducted the election at the usual and appointed polling place, within the room in the Masonic building, was the lawful town election board of that day. It follows that the place afterwards opened on the opposite side of the street was not the lawful place for holding that election; that the persons there acting as judges and clerks had been deprived of their authority by their own delay and inability to act, and by the lawful conduct of the citizens present; and that the person receiving the greater number of votes in the street was not lawfully elected.

The rulings of the court upon the propositions of law presented were substantially correct. The trial judge saw the witnesses, and could better determine than we where credit

should be given upon controverted questions of fact. The proof in the record warranted the judgment. It is therefore affirmed.

*Affirmed.*

FARMER, P. J.: I agree with the conclusion of my associates that Foltz was not legally elected supervisor, but I do not agree with a part of the reasoning of the opinion and numerous expressions therein.